**Melissa Potts EMERSON, Plaintiff,**

v.

**E.I. DU PONT de NEMOURS AND COMPANY, INCORPORATED and Richard A. Johnson, Defendants.**

No. 85 C 8868.

United States District Court, N.D. Illinois, E.D.

Jan. 25, 1989.

Jerome Pinderski, Pinderski & Pinderski, Palatine, Ill., for plaintiff.

Ronald J. Hein, Jr., Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

This is an employment discrimination case. The plaintiff, Melissa Potts Emerson, claims that the defendants, E.I. Du Pont de Nemours and Co., Inc. (Du Pont) and Richard A. Johnson, refused to promote or transfer her, and hornswoggled her into resigning because she is black. Emerson also alleges that the defendants' conduct has caused her severe emotional distress and created an obstacle to further employment. Both parties have moved for summary judgment.

### I

Du Pont manufactures and installs a machine called the Automatic Clinical Analyzer (ACA), which analyzes body fluids (such as blood). While in the army in the mid-1970's, Emerson worked with the ACA; and because of her experience Du Pont

hired her in September of 1978 to work as a technical representative (TR) in its Biomedical Division. As a TR, Emerson's job was to install ACAs and handle trouble-shooting. After several months of training, Emerson began actual duty in January of 1979; she chose to work in the southeastern United States, and was assigned territory in Charlotte, North Carolina; she reported to district manager Carol Orr.

Emerson's performance was plagued with problems from the start: she experienced difficulties completing installations as well as in working with customers and colleagues. She also had problems "relating to" Orr, but felt that Orr was a good manager who had treated her fairly. But after two months Emerson's territory was realigned, and she began reporting to Tom Luhr, and Luhr quickly grew dissatisfied with her job performance. During her tenure under Luhr the main source of difficulty was her inability to get on with those around her, customers and co-workers alike. Members of both groups complained about her attitude.

About this time, Eugene Brown, Du Pont's Regional Manager for the Central Region, asked Bill Otto, Brown's counterpart in the Southeastern Region, to release Emerson to fill a position in Du Pont's new Recertification Center (RC). Otto assented, and Emerson was transferred. Du Pont's plan was to refurbish used ACAs for resale; and Emerson's job was to ensure that the refurbished machines performed satisfactorily. Emerson performed her technical duties adequately, but her relationship with co-workers did not improve; she also found it difficult to handle pressure. (There is perhaps a relationship between these problems, but it is one on which we need not speculate.) These problems continued throughout 1982 and 83. Emerson's job evaluations for those years show her performance as satisfactory—though barely so—but having no potential for promotion or supervisory duties.

During this time Emerson was involved in more than her job: she married Dean Emerson in December of 1982. But they lived apart: he, in Iowa and Minnesota; she, in Illinois. They saw each other about twice a month.

In early 1983, Johnson, a district manager, selected Emerson to handle phone calls and do troubleshooting for 4 of his 10 salesmen, as well as some ACA installations. Emerson was less than enthusiastic about taking all of these calls right away; but she did the job, and after approximately one month of taking calls on a trial basis, she transferred to Johnson's district in April or May of 1983. For this job, Emerson worked out of her home and was provided with a company car. Her workday ran from 6:30 a.m. until 5:30 p.m., averaging 20–25 calls per day. Though her milieu changed, her problems didn't. And they led to a warning that continued substandard performance would mean the loss of the company car and working out of the regional office, instead of her home.

In February of 1984 Emerson moved back into the regional office to help Dan Kilgore, a chemistry specialist, and for further training. Though she worked fewer hours (8:00 a.m.—4:30 p.m.), she was fielding more calls, about 35 per day. The increased number of calls was caused by overflow from other districts when other TRs were unavailable or overloaded; this volume was not unique to Emerson, however, each of the four TRs, in the Central Region, faced the same workload.

In January of 1984 Emerson suffered both physical and mental problems. She began to show signs of emotional wear, apparently because her marriage was falling apart and because her workload had increased. About this same time, Emerson's personal physician treated her for stress-related symptoms, hypertension, and a back injury. Two months later, in March, while at a sales kickoff meeting, Emerson told Donald Sutherland, Du Pont's Director of Clinical Systems Division, that she intended to resign in the near future. She later told Johnson the same thing.

Emerson announced her intent to resign as of July 13. She gave three reasons: (1) her husband's new job, (2) she sold her home, and (3) she did not know what her next position with Du Pont would be. Fol-

lowing foot surgery in April, Emerson returned to work on July 9; she resigned exactly one week later, on July 16. Du Pont accepted her letter of resignation. In the letter of acceptance, Johnson, on behalf of Du Pont, denied the last of Emerson's reasons for leaving; he informed Emerson that Du Pont had continued employment for her. Emerson signed the acceptance letter, acknowledging that she had read it and understood it.

By letter dated 3 August 1984 Emerson sought to withdraw her resignation because the sale of her home fell through. Du Pont refused, in general because it has a general policy of not rehiring resignees, and in particular because Emerson only wanted her job back until she could sell her home and relocate with her husband (apparently when he returned from Saudi Arabia in the Spring of 1985). Emerson was less than enthusiastic about Du Pont's decision, and registered her displeasure, first in the form of an administrative claim in the Illinois Department of Labor (which she won) and now as a civil rights complaint here.

## II

Emerson's first claim is that the defendants refused to promote, transfer, or rehire her once she had resigned because she is black, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq. The defendants argue that Emerson cannot establish a prima facie case of discrimination under the shifting-burdens-of-production method[1] enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The defendants also contend that even if Emerson could make out a prima facie case, they can articulate legitimate, non-discriminatory reasons for their conduct which Emerson cannot show to be a pretext for discrimination. Unsurprisingly, Emerson sees things a little differently.

Under the method of proof set out in *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. In order to do this in a given fact scenario, he must prove (1) he belongs to a protected group, (2) that he is situated similarly to members of the unprotected class, and (3) he was treated differently than members of the unprotected class. *Collins v. State of Illinois*, 830 F.2d 692, 698 (7th Cir.1987). If the plaintiff makes out a prima facie case, the burden of production (not persuasion) shifts to the defendant, who must articulate legitimate, non-discriminatory reasons for his actions. Once the defendant satisfies this relatively insubstantial burden, the presumption of discrimination created by the prima facie case dissolves, and the plaintiff must demonstrate by a preponderance of the evidence that the defendant's reason is a mere pretext for discrimination.

The defendants argue with some force that Emerson cannot establish a prima fa-

---

1. Emerson takes issue with the defendants' use of the *McDonnell Douglas* test and cites a ragbag of cases in apparent support of the proposition that the test is inapplicable here. Because her argument is so poorly developed, however, we are entitled to disregard it. See *National Metalcrafters, Div. of Keystone v. McNeil*, 784 F.2d 817, 825 (7th Cir.1986); *Harden v. Peck*, 686 F.Supp. 1254, 1261 (N.D.Ill.1988). And we do so here.

She also hints at the fact that the defendants' actions violate Title VII under a disparate impact analysis. See *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). This also is made "in so perfunctory and undeveloped a manner" that we cannot address it. For example, Emerson has neglect-

ed to identify the criterion which has caused the alleged disparate impact; and she has not presented sufficient data from which can be drawn a reliable inference of substantial adverse impact upon blacks. See *Watson v. Fort Worth Bank and Trust*, — U.S. —, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (plurality opinion); *Mays v. Chicago Sun–Times*, 865 F.2d 134, 137 n. 2 (7th Cir.1989); *Tagatz v. Marquette University*, 861 F.2d 1040, 1042–43 (7th Cir.1988).

It is also entirely possible that Emerson refers to these cases in order to illustrate the fact that the *McDonnell Douglas* test is not the exclusive method by which a plaintiff can establish a Title VII violation. If so, we agree with the general observation but fail to see how it changes our analysis here.

cie case of discrimination.[2] We find it unnecessary to consider this argument because we are convinced that Du Pont can articulate legitimate non-discriminatory reasons for its conduct; and that Emerson has not adduced evidence sufficient to create an issue of material fact that Du Pont's reasons are a mere pretext for discrimination.

Assuming for purposes of this motion that Emerson could establish a prima facie case of discrimination for each of the alleged discriminatory acts, the defendants offer the following explanations. With respect to Emerson's claims that she was not promoted or transferred because she was black, the defendants state that Du Pont had an ongoing need for her services in the Central Region office because it was short of help. Regarding the allegation that Du Pont refused to accept Emerson's withdrawal of her resignation because of her race, the defendants assert that the substance of her August 3 letter seeking withdrawal of her resignation (she wanted her job back because the sale of her condominium fell through) indicated that she was not committed to working for Du Pont; and therefore Du Pont rejected her request. Both reasons are legitimate and non-discriminatory; and therefore the defendants have satisfied their burden. The burden of production thus shifts back to Emerson, who must offer admissible evidence sufficient to create a genuine issue of material fact that these reasons are pretextual. *Mays v. Chicago Sun–Times,* 865 F.2d 134, 136–37 (7th Cir.1989); *Klein v. Trustees of Indiana University,* 766 F.2d 275, 282 (7th Cir.1985).

Emerson can establish pretext directly by persuading us that a discriminatory reason more likely motivated Du Pont's actions or indirectly by showing that Du Pont's explanations are unworthy of credence. *Texas Department of Community affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Emerson attempts to use both of these methods. The Seventh Circuit has held that a plaintiff may demonstrate that an employer's reasons are unworthy of belief through evidence "showing (1) that the proffered reasons ha[ve] no basis in fact, (2) that the proffered reasons did not actually motivate [the employer's actions], *or* (3) that they were insufficient to motivate [the employer's actions]." *Kier v. Commercial Union Insurance Companies,* 808 F.2d 1254, 1259 (7th Cir.1987) (emphasis in original). Accord *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1364–65 (7th Cir.1988).

We are persuaded that Emerson has not made a showing sufficient to create a genuine issue of material fact regarding the credibility of Du Pont's explanations. We do not sit as a Solomonic tribunal that passes on the wisdom of an entity's employment decisions. *Mechnig,* 864 F.2d at 1365. Rather, we review such decisions under Title VII only to determine whether the employer has provided an honest explanation of its conduct. *Id.* See also *Anderson v. University of Wisconsin,* 841 F.2d 737, 741 (7th Cir.1988) (Title VII "ensures only equal treatment and not 'correct decisions'.").

As an initial matter, we note that each of Du Pont's reasons has a basis in fact; and Emerson has cited no evidence of record which would undercut Du Pont's position that it had an ongoing need for TRs in the Central Region. This leads us to Emerson's contentions that her position was being "eliminated", and that the other three TRs in the Central Region were being reassigned while she was being squeezed out. The only specific factual allegation Emerson makes regarding the elimination of her job is based on an unreviewed factual finding by an Illinois administrative referee

---

2. The defendants' argument is based on a version of *McDonnell Douglas* under which the plaintiff must plead and prove (1) he belongs to a protected group, (2) he applied for and was qualified to do a particular job for which the employer was seeking applications, (3) he was rejected, and (4) the employer kept the job open and continued to seek applicants with the plaintiff's qualifications. *See* Defendants' Memorandum in Support of Motion for Summary Judgment, at 26. Because the *McDonnell Douglas* test was not "intended to be rigid, mechanized, or ritualistic", however, we prefer to use the more generic formulation set out in *Collins.*

arising out of a proceeding in the Illinois Department of Labor.[3] Plaintiff's Statement of Facts, No. 43. In his decision, the referee found that Du Pont intended to eliminate Emerson's job as of 1 October 1984. *See* Plaintiff's Ex. 19. This finding is of no help to Emerson, however, in light of *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), which held that unreviewed factual determinations by a state agency are not entitled to preclusive effect in a subsequent Title VII discrimination suit in federal court. See also *Duggan v. Board of Educ. of East Chicago Heights,* 818 F.2d 1291, 1293 (7th Cir.1987). We move on.

Closely related is Emerson's allegation that prior to resigning Du Pont management informed her that Du Pont had no position for her (presumably due to the reorganization). It is true that a Du Pont managerial study conducted in March and April of 1984 recommended that ACA service and chemistry telephone support should be consolidated with other support branches in Wilmington, Delaware; the study also concluded that the consolidation would foster efficiency and allow Du Pont to eliminate four "specialist" positions (apparently, a TR position falls in this category). Plaintiff's Ex. 44. It is also true that about this same time Johnson told Emerson that he had no information about the Wilmington center's staffing requirements in general, or about Emerson's future in particular. But this does not mean that Du Pont did not have a job for Emerson.

If this were all the evidence regarding Emerson's future with Du Pont, then we would have a question of fact for the factfinder to decide at trial: Emerson says she was told Du Pont had no job for her; and Du Pont says it only told her it did not know what her future with the company was. But this is not the only evidence we have. There is also Du Pont's letter of acceptance of Emerson's resignation, which states that: "[Du Pont] has no intention of terminating you for lack of work. We have continued employment for you. You are electing to resign." Defendants' Ex. 18. The letter also advised Emerson that because she was resigning voluntarily she was not eligible to receive severance pay or other company benefits. Emerson signed the letter indicating that she read it and understood it; and she does not challenge it now. Rather, she charges that Du Pont "changed its tune" once she tendered her letter of resignation. As we see it, however, it makes little difference what tune Du Pont was whistling before it accepted Emerson's resignation. What is important is that at the time Du Pont accepted her resignation, she understood that Du Pont had continued employment for her. And there is no evidence that Emerson sought to withdraw her resignation once she understood that she was not being squeezed out of Du Pont's future.[4] And without some such evidence it is unreasonable to conclude that the prospect of continued employment was a determining factor in her decision to resign.

With respect to Du Pont's decision to decline Emerson's request to withdraw her resignation, she argues that Du Pont's stated reason is not credible because it

---

**3.** Emerson also states (see her Statement of Facts, No. 20) that "rumors" were bruited about Du Pont for several months that TR positions would be eliminated. But it is difficult to see how the existence of these rumors can establish that Du Pont actually intended to eliminate *her* position.

**4.** In her letter of 4 August 1984 seeking reinstatement, Emerson refers to her "disagreement" with Johnson that Du Pont had continued work for her. She characterized her resignation as "involuntary" because Du Pont had not offered her a job, unlike the other TRs.

In this letter, Emerson also advised Johnson that the sale of her condominium fell through, dashing her hopes to "spend the next two weeks

getting relocated with my husbands [sic] help before he leaves next month", and she requests to return to work "[s]ince [her] resignation doesn't take effect until October 4, 1984."

The only reasonable reading of Emerson's August 3 letter is that she wanted to return to work *because* the sale of her condominium did not go through, and that there was no realistic possibility that she could sell it before the following Spring, when her husband returned (from where is the subject of dispute). The reason this is important is that it shows that Emerson's decision to seek a return to work was not prompted by Du Pont's statement that it had continued employment for her.

rehired Johnson after he resigned to work for a competitor of Du Pont in October of 1984. Since Johnson is white, the difference in the decisions, according to Emerson, can only be attributed to race. The problem with this line of reasoning, however, is that it doesn't go far enough. Emerson offers no evidence showing that the circumstances involved in Johnson's return to work were similar to those involved in her attempt to do so. In particular, she does not suggest that Johnson indicated that his return to work might be temporary. As we noted elsewhere (see footnote 4), Emerson's request to return to work highlighted the fact that the sale of her condominium fell through, and that there was no hope of selling it until the following Spring. In our view, this difference is sufficient to render Emerson's comparison between Johnson and herself of little value.

In addition, Du Pont offered evidence, which Emerson has not rebutted, that it refused to allow a white salesman, Jerry Daley, to withdraw his resignation around the same time it refused to let Emerson do so. *See* Deposition of Eugene Brown, at 146–48.

Emerson also attempts to establish affirmatively that the defendants' actions were motivated by reasons of race. To this end, she argues that of the four TRs in the Central Region she was the only black, and that her three white co-workers were promoted or transferred while her job was being eliminated. We have already spelled out why we do not believe that job "elimination" was not a factor in her decision to resign. We now consider the evidence regarding the other TRs in the Central Region, Mary Jo Gale, John Okesson and Joan Mittlsdorf.

In April of 1984 Gale was reassigned to Ohio. According to the defendants her transfer was based on her "excellent electromechanical skills" with the ACA. Emerson points to no evidence to suggest this is false. Emerson does not, for example, contend that she possessed the same qualifications as Gale, or that Gale in fact lacked superior electromechanical skills with the ACA, or that such skills were unnecessary or unrelated to the position to which Gale was transferred. With respect to Okesson, the evidence establishes that he was reassigned *temporarily* to a sales position based on his prior experience, which Emerson lacked, and after which he returned to his job as a TR. Again, Emerson offers nothing to rebut this.

The evidence regarding Joan Mittelsdorf is that in August of 1984 she was reassigned to a field position in Nebraska. At the time Emerson resigned, however, Mittelsdorf was still working as a TR in the Central Region taking calls along with Dan Kilgore. Mittelsdorf's transfer *after* Emerson's resignation does not support an inference that Du Pont failed to transfer Emerson because of her race.

Emerson also contends her resignation was "orchestrated", that Du Pont preyed on her frazzled state. Her support for this theory consists in the fact that Du Pont was aware of her fragile emotional condition and nevertheless increased her workload, ultimately leaving her to do the work of four people. But the evidence of record establishes otherwise: at the time Emerson tendered her resignation, Mittelsdorf and Kilgore—both white—were fielding calls from customers. *See, e.g.*, Emerson's August 3 letter requesting to return to work: " * * * I am sure that Joan [Mittelsdorf] and Dan [Kilgore] would appreciate my help with the calls." Defendants' Ex. 19. Emerson was not doing the work of four people, and more importantly white employees were being treated just as she was.

We now turn to Emerson's argument that the defendants' articulated reasons are pretextual because three blacks employed in the Central Region left Du Pont citing the "lack of opportunities" as shown by Du Pont's "turnover" studies. Quite frankly, we are unsure of what to make of this argument, because this is as far as Emerson takes it. But to put the point is to see why it is of no help to Emerson: two of the three black employees *left Du Pont*, Du Pont did not leave them. Emerson's point, however, might be that the black employees left because there was a lack of opportunities for *black employees*. The

turnover studies do not support this conclusion, however. Faye Henson, a black female, resigned from Du Pont on 15 October 1982 after more than six years of service. True, in an exit interview with Du Pont personnel management, Henson stated that she was leaving in order to pursue "a career [which] she would enjoy more [and which would] offer more opportunities." But this statement does not support the conclusion that Du Pont offered too few opportunities *to blacks;* it reaches all employees, white and black. Henson wanted to make more money, and she was tired of managing a territory; and as far as her exit interview goes, if anything, it establishes that her resignation had nothing to do with her race. Most telling is the section labeled "Individual Treatment", in which Henson indicated that she "[f]elt she had been treated fairly" by Du Pont. Defendants' Ex. 28.

Bennie Flagg, a service representative, voluntarily resigned from Du Pont in March of 1984 in order to live on a farm he had recently inherited. Emerson responds with silence.

Finally, William Butler resigned at Du Pont's recommendation. Granted, Butler stated that Du Pont's "system fosters discrimination", leaving no management opportunities for minority employees; but he cannot not attribute his loss of job to it. After all, he was asked to go; he did not leave because he foresaw no opportunities in the future. Nor does Butler provide any support for his charge of discrimination, he merely throws out the accusation. And charges of discrimination are, as *Stevens v. Tillman,* 855 F.2d 394, 402 (7th Cir.1988), recognized, common coin. It would be odd indeed to allow Emerson's unsupported charge of discrimination to go to trial on the basis of Butler's unsupported charge of discrimination.

Emerson also claims that Johnson told her Du Pont "wanted to eliminate blacks and all minorities." Emerson's Statement of Facts, No. 55.[5] At first blush this might seem to save Emerson's discrimination claim from certain dismissal: since Du Pont wanted to get rid of all its black employees it follows that it wanted to get rid of Emerson. The catch, however, is that Du Pont did not get rid of Emerson: she resigned. Therefore, Johnson's statement is of little use here. And if Emerson is arguing that she was "eliminated" by virtue of Du Pont's "orchestrated" effort to prey on her frayed emotional state, then her argument fails for the reasons set forth above.[6]

This leaves us, finally, with Emerson's assertion that Brown is a racist. She bases this accusation on two snippets of testimony from his deposition. In the first Brown described a white employee of Du Pont as a "fraternity brother", Brown Dep. at 146–48. While this offhand remark appears to carry racial implications, they quickly disappear when placed into the larger context of the deposition. In the relevant passage Brown recounted his *refusal to rehire* a white salesman (Jerry Daley) who had voluntarily resigned. As we previously observed, this testimony cuts against rather than favors Emerson's position (see p. 13 above). To accept Emerson's characterization of Brown as a racist based on this remark, despite his conduct which suggests the contrary, would make words speak louder than actions. It would force us to draw an unreasonable inference from the facts; and this we will not do.

Brown also testified that Du Pont had shown great confidence in a certain black

---

**5.** We recognize that Johnson's alleged statement is supported by the deposition testimony of the plaintiff's husband, Dean Emerson. This, in turn, raises possible hearsay concerns. We need not address these, however, because the statement, even if true, is irrelevant in light of the fact that Emerson left her position voluntarily.

**6.** Emerson also refers to statistical "data" which are too poorly presented to provide reliable results or inferences. For example, the fact that Du Pont's ACA Division employed 119 people, 11 of whom were "minorities", does not, in our view, constitute data from which a reliable inference of discrimination can be drawn. We are not told, just to illustrate one weakness, why the ACA Division is the relevant employment population. See *supra* n. 1 and the cases cited there.

employee by sending him into the South to sell its products. Now, this comment does imply something about Southerners and racism, but it carries no such implication about Brown. And that is all that counts here.

## III

Emerson has not presented evidence sufficient to create a genuine issue of material fact that the defendants' reasons for not promoting or transferring her and refusing to rehire are pretexts for race discrimination. Therefore, we enter judgment for the defendants on Emerson's Title VII claim, deny Emerson's motion for summary judgment, and dismiss her pendent state claims for want of subject matter jurisdiction. See *Argento v. Village of Melrose Park*, 838 F.2d 1483, 1491 (7th Cir.1988).